### AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION OF AMERICA, AFL–CIO, LOCAL UNION NO. 1369

v.

### SYNTHANE TAYLOR CORP.—TAYLOR DIVISION.

Civ. A. Nos. 83–4097, 83–4258.

United States District Court,
E.D. Pennsylvania.

March 11, 1985.

Richard S. Meyer, Philadelphia, Pa., for plaintiff.

Carter R. Buller, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

Defendant, Synthane Taylor Corporation (Synthane) has filed motions for summary judgment against the plaintiff, Amalgamated Clothing and Textile Workers Union of America, AFL–CIO, Local 1369 (Union). The Union filed suit[1] to vacate two arbitration awards which were entered in favor of the defendant. This dispute involves a plant closing which has idled approximately 150 union members. The Union has cross-moved for summary judgment against Synthane. The arbitration was necessitated by a difference in the interpretation of two provisions in the collective bargaining agreement (agreement) covering vacation benefits and severance pay. In addition, the plaintiff also alleges that defendant's failure to provide severance pay benefits violates the Pennsylvania Wage Payment and Collection law, 43 Pa.C.S.A. § 260.1 *et seq.*

### FACTS

The Union represented the production and maintenance employees at the now closed Taylor division plant of the Synthane-Taylor corporation.[2] The plant was engaged in the production of unclad laminates, copper clad laminates and special circuitry used in electrical insulation. In September, 1982, Synthane notified the em-

---

1. Civil Action No. 83–4097 is a suit to vacate the award denying severance pay and No. 83–4258 seeks to vacate an award denying vacation pay.

2. Synthane-Taylor Corporation had two plants, the Synthane division plant and the Taylor division plant. The Taylor division was located in Valley Forge, Pennsylvania.

ployees of the Taylor division that the company was contemplating permanently closing their plant. It was eventually phased out of operation in March, 1983.

The economic reasons for closing the Taylor plant are found in a fiscal report highlighting the financial results from 1978 to 1982. During that period the division's profitability, measured by operating income and return on investment, had decreased substantially each succeeding year. This downward trend had not gone unnoticed by the senior management of Alco Standard, the parent corporation of Synthane-Taylor.[3] In July, 1982, Frank Kelly, Group President of Alco Standard, proposed transferring the production of industrial laminates from the Taylor plant to the Synthane facility. All other operations at the Taylor division would be terminated.

In Mr. Kelly's report detailing the reasons for his decision he wrote:

The relocation is being proposed as the definitive resolution to a critical and probably chronic operating problem at the Taylor division ... a problem whose magnitude is best exemplified by the $10 million of capital employed with a negative return.... the Taylor division has been marginally profitable since 1979.... The major problems are: competitive pricing at below cost levels in copper clad laminates; a substantial amount of overhead unabsorbed by volume ...; antiquated equipment; and high labor rates. Interim efforts at circumventing any of these elements have provided little hope for attaining any short or medium term turnaround.

Mr. Kelly concluded his report by stating only one product segment possessed the favorable market characteristics and profitability necessary to economically justify its continuation.

Synthane notified the Union in September, 1982 that its Valley Forge plant would be permanently closed. The greater part of the Union employees worked their last day on December 21, 1982. Eleven others finished up eight days later and a skeleton crew was retained until the plant was closed in March, 1983.

When the shutdown of the plant was announced, the Union cited provisions in their agreement which they interpreted provided for severance pay. The agreement read in part:

In case the Company permanently shuts down a department or section— Any employee or employees with (5) years or more of continual service who are laid off because of technological reasons, including, but not limited to changes in plant or equipment or changes in process operations which cause jobs to be abolished, will be given an opportunity for severance pay under the following conditions ...[4]

It was the Union's contention then, as it is now, that the shut down was due to technological reasons. Synthane vigorously disagreed with the Union's position and the dispute over the meaning of this provision was submitted to arbitration.

The Union predicated its case on a series of events preceding the plant closing. Synthane had transferred a number of its product lines to other plants. The machines and equipment used to produce these products were transferred also. During the years 1974–1980, the company had to deal with a number of environmental problems involving air and water polution and sewerage disposal. The Union believed that the shut down was for "technological reasons" since it was based on environmental mandates, changes in plant and equipment and changes in the production process.

The Union sought to have the arbitrator interpret technological changes to include not only those instances where a machine replaces a person, but also those instances

---

**3.** Synthane was a wholly owned subsidiary of Alco Standard Corporation. The president of Synthane reported to Mr. Frank Kelly, a group president at Alco. Mr. Kelly had, in addition to Synthane's president, 15 other presidents of various Alco subsidiaries reporting to him.

**4.** Article 8, Section 14 of the April 26, 1981 Agreement.

where the company chooses not to upgrade or modernize its existing equipment.

The arbitrator rejected this broad interpretation holding that the provision was not intended to cover "technological changes the company *should have made* to keep the plant in operation." (emphasis added).[5]

The arbitrator was clearly influenced by the bargaining history surrounding the wording of the severance pay provision. During negotiations, the Union submitted a severance pay proposal to be included in the collective bargaining agreement. The Union's proposed clause would have provided benefits to any employee who was laid-off regardless of the reason, be it relocation, financial failure, obsolete plant and equipment or technological improvements. The proposed clause read:

In case the company permanently shuts down a section, department or curtails total operation due to relocations, obsolescence of plant or equipment, financial failure or because of technological reasons....[6]

This proposal was rejected by Synthane's management in lieu of the more restricted language reading in part: "[a]ny employee or employees with (5) years or more of continual service who are laid off because of technological reasons ..."[7]

The arbitrator reasoned that to adopt the Union's expansive reading of the severance pay provision would be to award them in arbitration what they could not gain through collective bargaining.[8]

The Union appeals from the arbitration holding on two points. First, the arbitrator misinterpreted the contract language by requiring that the lay-offs be due to the introduction of new technology. Second, the Union asserts that Synthane withheld pertinent information from the arbitrator which may have influenced his decision.

The second grievance raised by the plant closing is a dispute over the employees vacation benefits. The agreement provided that "an employee on the employment record of the company on July 1 of each year shall be entitled to vacation time off based upon the continuous service he has with the company ..."[9]

The company interpreted the phrase "on the employment records" as synonymous with working. Since no union members were working as of July 1, 1983, vacation benefits would not be available. The Union's position was that the company, although shut down, never maintained "employment records", therefore, other sections of the agreement which reference union members status dictate who were and were not employed by Synthane. Specifically, the agreement provides that an employee retains his seniority for 24 months after his lay-off. Since a plant closing does not cause the employee to forfeit his seniority rights, then he is still an employee of the company eligible for vacation pay.

The arbitrator ruled against the Union stating that (1) they failed to meet their burden of proof that the laid-off employees maintained any employment status with Synthane as of July 1, 1983; (2) past practices indicated that employees on lay-off status did not receive vacation pay if they were not working on July 1 or recalled subsequent to that date.

The Union appeals the vacation pay decision as simply irrational in light of the facts presented.

The court will discuss each of these issues raised by the Union *seriatim.*

## DISCUSSION

In reviewing an appeal from a labor arbitration decision, the threshold question faced by the district court is what is the appropriate scope of review? In the seminal case of *United Steelworkers of Amer-*

---

5. Page 11, Severance Pay, Arbitrator's Decision.

6. Page 6, Severance Pay, Arbitrator's Decision.

7. Article 8, Section 14 of the April 26, 1981 Agreement.

8. Page 11, Severance Pay Arbitration Decision.

9. Article 5, Section 9 of the April, 1981 Agreement.

*ica v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) the Supreme Court held that lower courts are without power to conduct plenary reviews on the merit of the arbitrators awards. Such reviews would render meaningless the provisions of collective bargaining agreements calling for the decisions of the arbitrator as final. *Id.* at 599, 80 S.Ct. at 1362. "[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* at 599, 80 S.Ct. at 1362. The Court clearly indicates that arbitration awards are to be upheld as long as the award "draws its essence from the collective bargaining agreement." *Id.* at 597, 80 S.Ct. at 1361.

In *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123 (3d Cir.1969) the court discerned the phrase "draws its essence" to mean:

> If the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principal of contract construction and the law of the shop, may a reviewing court disturb the award.

*Id.* at 1128.

■ Thus, the scope of our review is narrow, we may not overturn a decision merely because this court would interpret the contract differently. *Enterprise, supra; Teamsters Local No. 115 v. DeSoto,* 725 F.2d 931, 934 (3d Cir.1984); *Mead Corp. v. Int'l Printing and Graphic Communications Union,* 572 F.Supp. 786, 790 (E.D.Pa.1983) (quoting *Enterprise Wheel,* 363 U.S. 599, 80 S.Ct. at 1362).

I. Did the Arbitrator's decision to reject the Union's severance pay grievance draw its essence from the collective bargaining agreement?

■ The arbitrator ruled "laid off because of technological reasons" to address only affirmative technological advances undertaken by Synthane which displaces Union employees. The arbitrator explicitly stated his reasons for so deciding as based upon the plain wording of the provision coupled with the bargaining history the parties established in wording the severance pay clause. The Union seeks to have this court place a broader meaning upon the phrase than was done by the arbitrator, yet this is the very act this court is forbidden to do. *United Steelworkers of America v. Enterprise, supra.*

It does not strain the imagination to find that one could very well interpret technological reasons more broadly to encompass those instances where state of the art equipment is not purchased because of cost or where a shutdown occurs in the wake of environmental mandates. We are, however, forbidden from simply placing a different interpretation upon words than that chosen by the arbitrator. The issue is not so broad, but must be placed in the more limited context of whether the decision, albeit different from the reviewing court would have arrived at, draws its essence from the agreement.

We see nothing that is inherently implausible in the decision to interpret the severance pay clause as limited to job losses directly attributed to technological advances *undertaken* by Synthane.[10] The Union's claim that the severance pay award be overturned on this basis will be denied.

II. Did Synthane fail to disclose pertinent information which could have influenced the arbitrator's decision?

■ In August, 1983, six months after the shutdown of the plant Alco Standard

---

**10.** Thus, had Synthane purchased a machine which displaced a worker, arguably the lay-off would be due to technological reasons.

announced plans to restructure by divesting itself of a number of subsidiaries including Synthane. These subsidiaries would form the basis of a new parent corporation, to be partially owned by Alco Standard.[11]

The restructuring by Alco was formalized almost one year after the decision to close the Taylor plant. The Union believes that a nexus may exist between the parent corporation's decision to divest and "technological reasons".

The chief operating officer of Alco Standard characterized the subsidiaries to be divested as not being in the forefront of high technology. Alco's decision to examine the future direction of its operating companies began in mid-1981. The Union believes that Synthane should have made known to the arbitrator the possibility that a restructuring of the parent corporation may take place. Since the subsidiaries which were not classified as "high tech" were all divested, the arbitrator could have been influenced by this information in formulating his decision.

An examination of the chronology of events leading to the plant closing and the subsequent restructuring by the parent corporation will be helpful. In July, 1982, Mr. Kelly, as Alco group president, placed his imprimatur on the plans to phase out the Taylor division. In September, 1982, the Union and its employees were told of the decision. The majority of the employees were released by December, 1982. The grievance procedure was initiated and the arbitrator ruled against the Union's grievance in April, 1983, one month after the plant was permanently closed. In late June and early July, 1983, Alco finalized which of its subsidiaries would be targeted for divestiture. There is no evidence to show that Mr. Kelly ever knew of Alco's decision to sever Synthane from its corporate family prior to June-July, 1983.

The uncontradicted facts show that Synthane placed all the pertinent information before the arbitrator and did not commit any fraudulent act. The Union has accused Synthane of harboring desires to reopen the Taylor division subsequent to a court decision. There is no evidence to suggest that the Taylor plant is about to reopen. The site is now the corporate headquarters for the parent corporation of Synthane, Alco Industries. Various parts of the building are leased to tenants in unrelated industries and Synthane intends to either lease or sell the remaining property at the plant site.

There is simply no evidence to suggest that fraud was committed by Synthane or even that information in their possession was withheld from the Union and the arbitrator. The plant was closed for economic reasons. The arbitrator's ruling recognized this fact and further held that the severance pay provision was operable only if affirmative technological advances displaced workers. We see no evidence that Synthane has undertaken any technological improvements in plant or equipment at the Taylor division plant since it was shut down in March, 1983. The arbitration award will be upheld and plaintiff's motion for summary judgment will be denied.

III. Did the arbitrator's award denying vacation benefits for Union members draw its essence from the agreement?

■ The provision of the agreement applicable to vacation pay reads:

An employee on the employment records of the Company on July 1 of each year shall be entitled to vacation time off based upon the continuous service he has with the Company, as of the date, in accordance with the following, provided he has worked a minimum of 1040 hours since the previous July 1: ....

The Union seeks vacation pay for the period July 1, 1983 through June 30, 1984. This pay is based on the hours worked in the preceding twelve (12) months—July 1, 1982 through June 30, 1983. Thus, the issue was a narrow one for the arbitrator

---

**11.** These subsidiaries were to be sold to their management in a leveraged buy-out scheme. Alco Standard would be at least a 20% owner of the new corporation.

and entailed only the question of whether employees who were terminated between December, 1982 and March, 1983 were on the employment records of the company on July 1, 1983.

We think that the arbitrator's decision was rationally grounded in the agreement and should be upheld. The arbitrator ruled first, that the Union failed to meet its burden of proving that the employees, at the time the vacation benefits vested (July 1, 1983), maintained any employment status with Synthane. The Union made much ado about the fact that there were no "employment records" per se maintained by the company. He stated that the Union presented no evidence that as of July 1, 1983 any of the affected employees were on any records of Synthane or that they had retained rights pursuant to any such records. Secondly, past practices indicated that no employees had received any vacation benefits when they were not working as of July 1.

The Union attacks the decision as irrational and contradictory in light of other clauses in the agreement. Specifically, Article 8, section 11 provides that the seniority of an employee shall end upon the termination of employment by Synthane as the result of certain enumerated causes. Seniority status is retained by an employee who is laid off for 24 months. The thrust of the Union's premise is that seniority within the Union equates to working for Synthane. This is a specious argument which the court must reject. There is no correlation between whether someone maintains his or her seniority within the Union and whether they are working. Lastly, the court notes that the arbitrator found no evidence which shows that the plant shutdown was attributable in whole or in part to any motivation by Synthane to deprive Union members of their vacation benefits. The record clearly shows that the plant was closed in March, 1983. The majority of the employees were terminated in December of 1982. No employee was working on July 1, 1983, nor were any recalled prior to that date. The decision of the arbitrator will be upheld.

IV. The State law claims.

Since the decisions of the arbitrator will be upheld, the plaintiff's claims against defendant under 43 Pa.C.S.A. § 260.1, *et seq.* must fail as a matter of law.

SUMMARY

A review of the facts indicates the arbitrator's rulings were within his sound discretion. There was no manifest disregard for the applicable clauses. Past history of the parties' dealings supported both decisions. In consideration of the foregoing, the court will not disturb the arbitration awards.

